In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00283-CV**

_____

**WILLIAM MORRIS, AS ADMINISTRATOR
OF THE ESTATE OF LARRY MORRIS, Appellant**

**V.**

**H G SPEC INC., ET AL, Appellees**

**On Appeal from the 172nd District Court
Jefferson County, Texas
Trial Cause No. E-190,617**

**MEMORANDUM OPINION**

In this interlocutory appeal, Plaintiff William Morris, as administrator of the

Estate of Larry Morris (Plaintiff or Appellant), appeals the trial court's orders

granting the special appearances of defendants Reliance Worldwide Pty Ltd, GSA

Group Pty Ltd, GSA Industries (Aust) Pty Ltd (the Reliance Defendants), and H G

1

Spec, Inc. (H G Spec) (collectively Appellees) and dismissing the claims against Appellees with prejudice.[1] We affirm.

Background

Plaintiff contends that on or about July 22, 2011, Larry Morris was a resident at the EduCare Community Living Corporation – Gulf Coast (EduCare) adult care facility, and he sustained second-degree and third-degree burns from hot water during a bath given by his caregiver. According to Plaintiff, Larry died as a result of his burns. Plaintiff filed suit against EduCare, Decresha Jenkins (Jenkins), Cash Acme, the Reliance Defendants, and H G Spec.[2] In Plaintiff's Fourth Amended

---

[1] Reliance Worldwide Pty Ltd filed its special appearance as "Defendant Reliance Worldwide Pty Ltd. Incorrectly Named as Reliance Worldwide a/k/a Reliance Worldwide Corporation, Individually and d/b/a Cash Acme[.]" GSA Group Pty Ltd filed its special appearance as "Defendant GSA Group Pty Ltd Incorrectly Named as the GSA Group, Individually and d/b/a Reliance Worldwide and Cash Acme[.]" GSA Industries (Aust) Pty Ltd filed its special appearance as "Defendant, GSA Industries (Aust) Pty Ltd d/b/a Reliance Manufacturing Co. and Its Division, Reliance Worldwide[.]"

[2] In August of 2011, Plaintiff William Morris, as Larry Morris's next friend, initially filed "Petitioner's Rule 202 Action to Discover Evidence and Perpetuate Testimony and Application for Temporary Restraining Order and Temporary Injunction[,]" naming EduCare Community Living – Texas and EduCare Community Living – Texas Living Centers, Inc. as Respondents (collectively EduCare). The Rule 202 suit regarding EduCare was assigned to the 172nd Judicial District Court, bearing Cause No. E-190,617. Plaintiff William Morris, as administrator of the Estate of Larry Morris, filed a separate suit against Cash Acme, a Division of the Reliance Worldwide Corporation and Decresha D. Jenkins, and it was assigned to the 136th Judicial District, bearing Cause No. D-194,356. In July

Petition (hereinafter "the petition"), the live petition at the time the trial court heard the Appellees' special appearances,[3] Plaintiff asserted that on the alleged date, one of EduCare's employees, Jenkins, was giving Larry Morris a bath, Jenkins turned on the water, and she left Larry Morris unattended. According to the petition, when Jenkins returned, she discovered that Larry Morris had been burned by scalding hot water in the bathtub even though a "scald protector" or Thermostatic Mixing Valve (TMV) allegedly designed, manufactured, and marketed by the Reliance Defendants and H G Spec, had been installed. In the petition, the Plaintiff specifically alleged

---

2013, the trial court granted Plaintiff's motion to consolidate the cases into the case pending in the 172nd Judicial District Court. H G Spec filed bankruptcy and the trial court severed the claims against H G Spec into a separate cause number to allow the matter to proceed against the remaining defendants. On January 28, 2015, the United States Bankruptcy Court entered an agreed order lifting the automatic stay solely to allow the parties to proceed with the litigation to "obtain, collect and enforce a judgment against any available insurance proceeds of Debtor H G Spec Inc." After the bankruptcy court lifted the automatic stay, the 172nd Judicial District Court then merged the claim against H G Spec back into the original case. On June 1, 2015, Plaintiff filed a motion for voluntary dismissal with prejudice of the claims against EduCare, announcing to the trial court that Plaintiff and EduCare had entered into a confidential settlement. The next day, the trial court granted the motion to dismiss EduCare. According to the appellate record now before us, Cash Acme did not challenge the trial court's jurisdiction and Cash Acme remains a party in the trial court below.

[3] On June 19, 2015, the trial court signed an order regarding Plaintiff's motion for leave to file his Fourth Amended Petition and "ORDERED that the Court will consider the allegations and claims made in Plaintiff's Amended Petition in ruling on Defendant's Special Appearance."

3

that EduCare and Jenkins were negligent in caring for Larry Morris, and Plaintiff also alleged negligence and strict liability causes of action against the Reliance Defendants and H G Spec.

The Reliance Defendants filed separate special appearances, and H G Spec filed a special appearance. The trial court held a hearing on the special appearances. The parties presented arguments to the trial court and relied on documents on file and exhibits admitted at the hearing, but offered no live testimony at the hearing. The trial court granted all four special appearances in separate orders. Plaintiff timely appealed.

## Issues on Appeal

In his first and second issues, Appellant maintains that the trial court erred in granting H G Spec's special appearance because personal jurisdiction exists as to H G Spec under the theories of both general and specific jurisdiction. In his third issue, Appellant asserts that the trial court erred in granting the Reliance Defendants' special appearances because the trial court had specific jurisdiction over all of the Reliance Defendants.

## Standard of Review and Applicable Law

Whether a trial court has personal jurisdiction over a defendant is ultimately a question of law that we review de novo. *Moncrief Oil Int'l, Inc. v. OAO Gazprom*,

414 S.W.3d 142, 150 (Tex. 2013); *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794-95 (Tex. 2002). The plaintiff has the initial burden of pleading sufficient allegations to bring a nonresident defendant within the jurisdiction of a Texas court. *Moncrief*, 414 S.W.3d at 149; *Kelly v. Gen. Interior Constr., Inc.*, 301 S.W.3d 653, 658 (Tex. 2010); *Retamco Operating, Inc. v. Republic Drilling, Co.*, 278 S.W.3d 333, 337 (Tex. 2009). If the plaintiff meets this initial burden, "the burden shifts to the defendant to negate all potential bases for personal jurisdiction the plaintiff pled." *Moncrief*, 414 S.W.3d at 149; *BMC Software*, 83 S.W.3d at 793. The defendant may negate the jurisdictional allegations on either a factual basis or a legal basis. *Kelly*, 301 S.W.3d at 659.

> Factually, the defendant can present evidence that it has no contacts with Texas, effectively disproving the plaintiff's allegations. The plaintiff can then respond with its own evidence that affirms its allegations, and it risks dismissal of its lawsuit if it cannot present the trial court with evidence establishing personal jurisdiction. Legally, the defendant can show that even if the plaintiff's alleged facts are true, the evidence is legally insufficient to establish jurisdiction; the defendant's contacts with Texas fall short of purposeful availment; for specific jurisdiction, that the claims do not arise from the contacts; or that traditional notions of fair play and substantial justice are offended by the exercise of jurisdiction.

*Id.* (footnotes omitted). There being no timely filed findings of fact and conclusions of law, "all facts necessary to support the judgment and supported by the evidence

5

are implied." *BMC Software*, 83 S.W.3d at 795.[4] If the appellate record includes the reporter's and clerk's records, these implied findings are not conclusive and may be challenged for legal and factual sufficiency in the appellate court. *Id.*

A trial court has personal jurisdiction over a nonresident defendant if the exercise of jurisdiction is authorized by statute and is consistent with federal and state constitutional due process guarantees. *Moncrief*, 414 S.W.3d at 149; *Spir Star AG v. Kimich*, 310 S.W.3d 868, 872 (Tex. 2010); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 2015). The Texas long-arm statute provides that certain acts constitute doing business in Texas, including, but not limited to, the following:

(1) contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part in this state;

(2)  commits a tort in whole or in part in this state; or

(3) recruits Texas residents, directly or through an intermediary located in this state, for employment inside or outside this state.

Tex. Civ. Prac. & Rem. Code Ann. § 17.042. Although an allegation of jurisdiction may satisfy the Texas long-arm statute, the allegation still may not necessarily

---

[4] Appellant asserts that this Court "should not imply facts in support of the trial court ruling, since there was no live testimony presented to the trial [c]ourt[,]" and that we "can (and should) conduct a full[] *de novo* review." As in *Moncrief*, our conclusions are unaffected by the operation of implied findings of fact and therefore we need not address this argument. *See Moncrief Oil Int'l, Inc. v. OAO Gazprom*, 414 S.W.3d 142, 150 n.4 (Tex. 2013).

6

satisfy the United States Constitution. *Moncrief*, 414 S.W.3d at 149. Accordingly, even if a court determines the facts satisfy the Texas long-arm statute, a court must also examine the facts to determine if the exercise of personal jurisdiction over the defendant comports with due process. *See CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex. 1996).

Asserting personal jurisdiction over a nonresident defendant comports with due process when (1) the nonresident defendant has minimum contacts with the forum state, and (2) asserting jurisdiction comports with traditional notions of fair play and substantial justice. *Retamco*, 278 S.W.3d at 338. The minimum contacts analysis requires "'some act by which the *defendant purposefully avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Michiana Easy Livin' Country, Inc. v. Holten*, 168 S.W.3d 777, 784 (Tex. 2005) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). The focus is on the defendant's activities and expectations. *Am. Type Culture Collection, Inc. v. Coleman*, 83 S.W.3d 801, 806 (Tex. 2002). A defendant's contacts may give rise to either general jurisdiction or specific jurisdiction. *See Moncrief*, 414 S.W.3d at 150; *Zinc Nacional, S.A. v. Bouche Trucking, Inc.*, 308 S.W.3d 395, 397 (Tex. 2010). Continuous and systematic contacts with Texas may give rise to general jurisdiction, while specific jurisdiction exists when the cause of

7

action arises out of or is related to specific purposeful activities of the defendant in Texas. *Moncrief*, 414 S.W.3d at 150. "The exercise of personal jurisdiction is proper when the contacts proximately result from actions of the nonresident defendant which create a substantial connection with the forum state." *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.*, 815 S.W.2d 223, 226 (Tex. 1991) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985)).

A trial court has general jurisdiction over a nonresident defendant when the defendant's contacts with the forum are systematic and continuous. *Spir Star*, 310 S.W.3d at 872. A court has general jurisdiction when the nonresident defendant's affiliations with the State in which suit is brought are so constant and pervasive "'as to render [the nonresident defendant] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 134 S. Ct. 746, 751 (2014) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011)).

Specific jurisdiction exists when there is evidence that the defendant purposefully availed itself of the forum's jurisdiction by contacts or activities in the forum state, and the cause of action arises from or is related to those contacts or activities. *Retamco*, 278 S.W.3d at 338 (citing *Burger King*, 471 U.S. at 472); *BMC Software*, 83 S.W.3d at 795-96. Under specific jurisdiction, the focus is on the relationship between the forum, the defendant, and the litigation. *Moncrief*, 414

8

S.W.3d at 150; *Retamco*, 278 S.W.3d at 338. There must be a substantial connection between the defendant's contacts and the operative facts of the litigation. *Moncrief*, 414 S.W.3d at 156. The contacts must be such that the defendant "should reasonably anticipate being haled into court" in Texas. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). With respect to tort claims, Texas's interest in protecting its citizens against torts is insufficient to automatically exercise personal jurisdiction when the nonresident directs a tort from outside the forum. *Michiana*, 168 SW.3d at 790-91. We must analyze the jurisdictional contacts on a "claim-by-claim basis" unless all claims arise from the same forum contacts. *Moncrief*, 414 S.W.3d at 150-51.

When considering whether the nonresident purposefully availed itself of the privilege of conducting activities within Texas, we look at three factors: (1) whether the defendant had contacts and activity in and with Texas; (2) whether the contacts relied upon were purposeful rather than random, fortuitous, or attenuated; and, (3) whether the defendant sought some benefit, advantage, or profit by availing itself of the jurisdiction. *Id.* at 151.

Plaintiff's Jurisdictional Allegations

Plaintiff alleged in the petition that H G Spec is "a Canadian company doing business in the State of Texas." Plaintiff made no further jurisdictional allegations in the petition as to H G Spec. Plaintiff alleged that Reliance Worldwide Pty Ltd and GSA Group Pty Ltd are "Australian compan[ies] doing business in the State of Texas[,]" and that GSA Industries Pty Ltd is "an Australian company[.]" Plaintiff further alleged that the Reliance Defendants "along with other affiliated companies . . . are all the same entity, created with the purpose of falsely portraying GSA Industries (Australia) Pty. Ltd. . . . as disconnected from the sale and distribution of Thermostatic Mixing Valves in the United States in general and Texas specifically." Plaintiff alleged that the Reliance Defendants "had continuous, systematic and sufficient minimum contracts[sic] with Texas, their actions were directed to the State of Texas, and they purposefully availed themselves of the benefit, advantage and profit of this jurisdiction[]" and that "[f]or purposes of the manufacture and distribution of products at issue in this case such as 'scald protectors' or thermostatic mixing valves, these Defendants operated not as separate entities but rather as a single business enterprise."

Plaintiff also alleged that H G Spec and the Reliance Defendants "acted in concert and with a specific joint intent to create corporate fictions and misleading paper agreements, when in fact the true relationship between [H G Spec and the

10

Reliance Defendants] ha[s] always been one of manufacturer and direct distributor of Reliance products into the United States generally and Texas specifically." According to the Plaintiff, "during a period of time, the Reliance Defendants possessed and exercised actual control of HG Spec's U.S. Sales Manager and network of Manufacturer's Reps, although during that time it also engaged in the subterfuge of having those persons remain related on paper to HG Spec when in fact Reliance was reimbursing HG Spec for the costs of said operations."

Plaintiff's Causes of Action

Plaintiff generally alleged that the defendants were negligent. Plaintiff alleged that H G Spec and the Reliance Defendants "are strictly liable to Plaintiff[] for designing, manufacturing, and placing into the stream of commerce the scald preventer, which was unreasonably dangerous for its reasonably foreseeable uses at the time it left the control of the Product Defendants because of design, manufacture and manufacturing defects, which were a producing cause of the occurrence in question." Plaintiff also alleged that one or more of the Reliance Defendants, Cash Acme, and H G Spec were negligent "in the design, manufacture, marketing and distribution of the scald preventer in question[.]"

11

Personal Jurisdiction as to H G Spec

According to the appellate record, during certain periods of time H G Spec was a supplier of certain plumbing products manufactured by others. In Plaintiff's petition, Plaintiff alleged that H G Spec is "doing business in the State of Texas." In its verified special appearance, H G Spec alleged that it is "a corporation organized under the laws of Canada[,] . . . is not a publically traded company[,]" . . . and "has its principal place of business in Quebec, Canada." According to the special appearance, "[t]here is no nexus between any act or omission by [H G Spec] in Texas[] and the death of Larry Morris[,] . . . the allegations against [H G Spec] do not arise out of any contacts between [H G Spec] and Texas[,] [H G Spec] has not consented to the jurisdiction of a Texas court[,]" [and] "[m]aintenance of this action against [H G Spec] in Texas would violate traditional notions of fair play and substantial justice[.] With respect to whether sufficient minimum contacts with Texas allow the trial court to exercise jurisdiction over H G Spec, H G Spec asserted the following in its special appearance:

> . . . [H G Spec] is a corporation organized under the laws of Canada.

> . . . [H G Spec] has its principal place of business in Quebec, Canada.

> . . . [H G Spec] has no offices, facilities or other places of business in Texas.

12

. . . [H G Spec] is not required to and has not maintained an agent for service of process in Texas.

. . . [H G Spec] is not registered to do business in Texas.

. . . [H G Spec] does not maintain a telephone listing in a Texas telephone directory.

. . . [H G Spec] has not contracted by mail or otherwise with a Texas resident with performance either in whole or in part in Texas.

. . . [H G Spec] does not solicit business in Texas.

. . . [H G Spec] does not have any bank accounts in Texas.

. . . [H G Spec] has not paid in taxes in Texas.

. . . [H G Spec] had not made application for or received a loan of money in Texas.

. . . [H G Spec] does not own any real property in Texas.

. . . [H G Spec] has not owned or maintained a warehouse or manufacturing plant within Texas.

. . . [H G Spec] has no members of its Board of Directors who live in Texas.

. . . [H G Spec] does not manufacture products sold in Texas.

. . . [H G Spec] does not distribute products for sale into Texas.

. . . [H G Spec] had no employees located in Texas.

. . . [H G Spec] has not committed any tort, in whole or in part, within the State of Texas.

Attached to the special appearance was a notarized affidavit of Jean Pichette, the President of H G Spec, wherein Pichette attested that he had read the special appearance, he had personal knowledge of the facts set forth in the special appearance, and that the facts are true and correct. H G Spec later filed a "Memorandum of Law of Defendant H G Spec Inc. In Support of Its Special Appearance Pursuant to Rule 120a." H G Spec attached an affidavit from Jean Pichette, as well as excerpts from the depositions of Terrence Scott and Troy L. Robb as exhibits thereto.

In the Memorandum of Law, H G Spec alleged that the TMV at issue in the case bears the marks "Heatguard #HG101" and "HG Specialties" on its cap. In Pichette's sworn affidavit attached to the memorandum of law, he further states as follows:

> . . . From approximately 1987 until January 28, 2002, at the latest, HG (known as HG Specialties, Inc. until approximately 2005) distributed plumbing and other products to wholesalers in Texas. During that time, HG had independent contractor agreements with manufacturers' representatives (also known as manufacturers' selling agents) in the United States (its "Rep Network"), including in Texas. HG's independent contractor manufacturers' representatives located in Texas solicited business for HG with Texas wholesalers. HG did not sell directly to end users in Texas; HG did not know the identity of the end users of products distributed by HG in Texas; and HG did not exercise control over to whom wholesalers in Texas sold products distributed by HG.

. . . HG sold its existing inventory of products, including its existing inventory of Heatguard #HG101 thermostatic mixing valves (TMVs) marked "HG SPECIALTIES" on the cap, as well as its Rep Network in the United States, to Reliance Worldwide Corporation through a Purchase Agreement made on August 27, 2001. Pursuant to this Purchase Agreement, the date for the transfer of HG's Rep Network and for payment of its inventory was January 28, 2002. Also pursuant to the terms of the Purchase Agreement, from September 2001 through January 2002, Reliance Worldwide Corporation agreed to make monthly payments to HG in exchange for Reliance Worldwide Corporation being given full direction of HG's sales manager, Rick Proulx, and the "USA business" on a day-to-day basis. Once HG transferred its inventory to Reliance Worldwide Corporation, HG had no control over any decisions regarding the sale or distribution of that inventory.

. . . After January 28, 2002, HG never distributed any products in Texas nor in any other way solicited business in Texas.

H G Spec attached a copy of a 2001 purchase agreement between H G Spec and Reliance Worldwide Corporation to the Memorandum of Law.

In his first issue on appeal, Appellant asserts the trial court erred in granting H G Spec's special appearance because general jurisdiction exists as to H G Spec in Texas. According to Appellant, the trial court had general jurisdiction over H G Spec, a distributor, based on H G Spec's written agreements with various manufacturer's representatives, two of which were responsible for Texas and were under the direction of "Sales Rep" Rick Proulx, who was allegedly employed by H G Spec and promoted products throughout the United States, including Texas. As an additional basis for general jurisdiction, Plaintiff alleged that H G Spec

15

. . . had for over a decade been contracting with a Dallas manufacturer of Beckett Corporation for items which it then distributed throughout Canada. In support of *this* business relationship, Mr. Pichette himself traveled to Dallas, Beckett Corporation's headquarters, on about 15-20 occasions. Considering that HG Spec only had a relatively small number of product lines, the fact that it contracted with a Dallas company for the supply of an entire segment of its operations shows that it was "at home" in Texas for business purposes and as such cannot claim that it is "foreign" to Texas merely when a suit is filed.

In Pichette's deposition, Pichette testified that H G Spec was a distributor of Beckett Corporation's "water gardening, ponds" products from 1987 to about 2008. He testified that his fifteen to twenty visits with Beckett Corporation during that time at Beckett's headquarters in Dallas were for the purpose of discussing "how to distribute the product into the Canadian market." Pichette swore in his affidavit that from 1987 to 2002 H G Spec distributed plumbing and other products to Texas, that H G Spec had independent contractor agreements with manufacturer's representatives across the United States and in Texas, and that H G Spec did not sell directly to end users in Texas, did not know the identity of the end users of products distributed by H G Spec in Texas, and did not exercise control over to whom wholesalers in Texas sold products distributed by H G Spec. According to Pichette, H G Spec then sold its inventory of TMVs to Reliance Worldwide Corporation pursuant to an August 2001 purchase agreement, Reliance Worldwide paid H G Spec to have the full direction of H G Spec's Sales Manager Rick Proulx and the daily

16

business in the United States from September 2001 through January 2002, and after January 28, 2002, H G Spec had no control over the distribution of its prior inventory and never distributed any products in Texas nor did it solicit business in Texas.

A court has general jurisdiction over a nonresident defendant who has "[c]ontinuous and systematic" contacts with the state. *Moncrief Oil*, 414 S.W.3d at 150. This test requires "substantial activities within the forum." *BMC Software*, 83 S.W.3d at 797. When a court has general jurisdiction over a nonresident, it may exercise jurisdiction "even if the cause of action did not arise from activities performed in the forum state." *Spir Star*, 310 S.W.3d at 872.

In *PHC-Minden, L.P. v. Kimberly-Clark Corporation*, the Texas Supreme Court characterized the inquiry for general jurisdiction as a "'more demanding minimum contacts analysis' with a 'substantially higher' threshold[]" than the requirements for specific jurisdiction. 235 S.W.3d 163, 168 (Tex. 2007) (quoting *CSR*, 925 S.W.2d at 595 and 4 Wright & Miller, Federal Practice & Procedure § 1067.5). Nevertheless, there is no "precise formulation[]" for determining which general jurisdictional contacts will be sufficient to "reach a tipping point[.]" *Id.* at 167.

"Usually, 'the defendant must be engaged in longstanding business in the forum state, such as marketing or shipping products, or performing services or

maintaining one or more offices there; activities that are less extensive than that will not qualify for general in personam jurisdiction.'" *Id.* (quoting 4 Wright & Miller, Federal Practice & Procedure § 1067.5). For general jurisdiction purposes, we do not view each contact in isolation. *Am. Type Culture Collection*, 83 S.W.3d at 809. The reviewing court carefully considers the contacts and analyzes them for "proof of a pattern of continuing and systematic activity[,]" and we look at the quality of those contacts, not just the quantity. *See id.* at 809-10.

Furthermore, even multiple contacts with a state may not be sufficient to establish general jurisdiction. *See, e.g.*, *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 415-19 (1984) (finding no "continuous and systematic" contacts with Texas, despite the fact that defendant had gone to Texas to negotiate a contract, purchased helicopters and related equipment from Texas vendors at regular intervals, and sent prospective pilots and other personnel to Texas for training); *see also Am. Type Culture Collection*, 83 S.W.3d at 807-10. (finding no general jurisdiction despite the fact that defendant had sold its products to Texas residents for eighteen years, had purchased supplies from Texas vendors, had attended conferences in Texas, and had served as a repository for Texas researchers).

In order for Texas courts to exercise general jurisdiction over H G Spec, H G Spec's contacts must be continuous, systematic, and substantial. *Moki Mac River*

18

*Expeditions v. Drugg*, 221 S.W.3d 569, 575 (Tex. 2007); *CSR Ltd.*, 925 S.W.2d at 595. The question is whether Plaintiff met his burden to present the trial court with evidence that H G Spec had substantial systematic and continuous contacts with the State of Texas to meet due process requirements and to allow the trial court to have general jurisdiction over H G Spec. The plaintiff must present more than isolated or sporadic visits with the forum before such contacts will constitute the type of continuous, systematic, and substantial contacts necessary for general jurisdiction. *See Helicopteros*, 466 U.S. at 415-19. After reviewing the entire record, we conclude the contacts between H G Spec and Texas have been sporadic and limited and fall short of the continuous, systematic, and substantial contacts necessary for a finding of general jurisdiction. *See id*. at 416; *Moki Mac*, 221 S.W.3d at 575. Issue one is overruled.

In his second appellate issue, Appellant asserts the trial court erred in granting H G Spec's special appearance because the trial court has specific jurisdiction over H G Spec. According to Plaintiff's Response to Defendants' Special Appearance, as well as Appellant's brief,

> . . . HG Spec set out, after having ended its prior distribution agreement for specialty plum[b]ing products, to replace it. HG Spec proposed to Reliance that it distribute Reliance TMVs and other specialty plumbing products throughout North America, that is to say throughout both Canada and the United States. Since HG Spec had previously distributed only in Canada, HG Spec, with the specific intent of

furthering its business, entered into a series of written agreements with various local companies that served as "Manufacturer's Reps" on its behalf throughout the United States. Two of these Manufacturers Reps encompassed the entire State of Texas between the[n]. These Manufacturers Reps, under the direction of a "Sales Rep" (Mr. Proulx) directly employed at first by HG Spec, promoted the HG Spec-branded products throughout the United States including Texas.

These efforts were hardly insignificant; in fact when Reliance later attempted to "cut HG Spec out" of the distribution process, HG Spec protested and ultimately ended up being paid nearly $500,000 for the distribution network that it had set up and the agreements that it had entered into with its Texas Manufacturers Reps and those from other States. Mr. Proulx frequently traveled through the U.S. including Texas; and HG Spec advertised in various trade magazines with distribution in Texas; all naturally for the goal of making sales and thereby profit for HG Spec and Reliance. As such, traditional notions of fair play and substantial justice support the argument that HG Spec, having taken these extensive affirmative steps to open up and promote the Texas market, should reasonably expect to have to answer a claim that one of the products that it promoted was defective.

Specific jurisdiction is limited to claims that "arise out of or relate to" a non-resident's forum contacts. *Burger King*, 471 U.S. at 472 (quoting *Helicopteros*, 466 U.S. at 414); *Retamco*, 278 S.W.3d at 338. In such cases, there must be a "substantial connection" between the defendant's contacts and the operative facts of the litigation. *See Moki Mac*, 221 S.W.3d at 585. Pichette's affidavit asserted that H G Spec sold its inventory pursuant to an August 2001 purchase agreement and that, after January 28, 2002, H G Spec did not distribute any TMVs in Texas or anywhere else. Plaintiff's counsel acknowledged at the hearing on the special appearances that "[t]here is some theoretical possibility that [the TMV in this case] actually got sold

20

to this [adult care facility] in Beaumont after HG Spec was out of the business[.]" After H G Spec negated Plaintiff's jurisdictional allegations as stated in the petition, the burden shifted back to Plaintiff to present some evidence to support Plaintiff's basis for personal jurisdiction as to H G Spec. *See Kelly*, 301 S.W.3d at 659.

As to Plaintiff's argument that the trial court had specific jurisdiction over H G Spec, Plaintiff had the burden to establish a substantial connection between H G Spec's contacts with Texas and the operative facts of the litigation. *See Moncrief*, 414 S.W.3d at 156. Although the valve in this litigation bears the marking of "HG Specialties" on the valve, H G Spec presented evidence that it distributed plumbing and other products to Texas wholesalers from 1987 to January 28, 2002, and that it sold both its existing inventory of TMVs marked with the name of "HG Specialties" and H G Spec's "Rep Network" in the United States to Reliance Worldwide Corporation by Purchase Agreement on August 27, 2001. H G Spec also attached a copy of its Sales and Distribution Agreement which provided that GSA Group Pty Ltd (trading under the "Reliance" name) could sell the products it purchased from H G Spec without changing the markings. H G alleged that Plaintiff had failed to present evidence linking the valve at issue in this litigation to H G Spec and that Plaintiff failed to establish a "substantial connection" between the operative facts of the underlying suit and the alleged contacts of H G Spec in Texas. *See Moki Mac*,

21

221 S.W.3d at 585. (explaining that there must be a substantial connection between the defendant's contacts and the operative facts of the litigation).

At the hearing on the special appearances and on appeal, Plaintiff cites to *Mi Gwang Contact Lens Co. v. Chapa*, No. 13-13-00306-CV, 2015 Tex. App. LEXIS 5872 (Tex. App.—Corpus Christi June 11, 2015, no pet.) (mem. op.). In *Mi Gwang Contact Lens*, fourteen-year-old Victoria Chapa purchased a pair of cosmetic contact lenses at a mall and subsequently experienced a corneal ulcer and infection in her left eye as a result of using the contact lenses. 2015 Tex. App. LEXIS 5872, at *1. Victoria's mother, individually and on behalf of Victoria, brought suit in Texas against multiple defendants including Mi Gwang Contact Lens Co., a Korean manufacturer of colored cosmetic contact lenses, and Clearlab, a Georgia distributor of Mi Gwang's contact lenses, for negligence and negligence per se regarding the sale and distribution of cosmetic contact lenses. *See id.* at **1, 22, 24. Mi Gwang Contact Lens and Clearlab filed special appearances contesting both general and specific jurisdiction. *Id.* at *2. The Corpus Christi Court of Appeals affirmed the trial court's denial of Mi Gwang Contact Lens's and Clearlab's special appearances. *Id.* at *33. In concluding that the exercise of personal jurisdiction in Texas over Clearlab was appropriate, the appellate court noted that, among other things, "the record contains multitudes of invoices and receipts documenting sales of Mi Gwang

22

contacts from Clearlab to dozens of Texas distributors and retailers." *Id.* at *24. The court also noted that "[t]he record indicates substantial sales, with concomitant profit, of contact lenses manufactured by Mi Gwang and distributed by Clearlab to the Texas market." *Id.* at **24-25. Contrary to the record in *Mi Gwang*, in the present case there is no evidence of invoices and receipts documenting sales of TMVs from H G Spec to any distributors, nor is there evidence in the record of a volume of sales or profits resulting from H G Spec's sales of TMVs to any distributor, seller, or wholesaler during the time period H G Spec sold TMVs, and further there is no evidence in the record as to the amount of inventory of TMVs transferred to "Reliance" as a result of the Purchase Agreement.

We conclude that, based upon the record before us, the trial court did not err in granting H G Spec's special appearance because the Plaintiff failed to present evidence to establish a substantial connection between H G Spec's forum contacts and the operative facts. H G Spec presented evidence to affirmatively rebut the jurisdictional allegation that it was "doing business in Texas." To the extent that the Plaintiff is generally alleging that H G Spec sold TMVs in Texas from 1987 to 2002, even if such allegations are taken as true, such facts would not, without something more linking that conduct to the operative facts in question, satisfy the "substantial connection" required for specific jurisdiction. *See Retamco*, 278 S.W.3d at 340; *see*

*also Spir Star*, 310 S.W.3d at 875 ("That similar products were sold in Texas would not create a substantial connection as to products that were not."). There is no evidence in the record that H G Spec supplied the valve at issue to the Texas EduCare facility, or that the valve was connected to the conduct of H G Spec in Texas. Issue two is overruled.

Specific Jurisdiction as to the Reliance Defendants

In his third issue on appeal, Appellant asserts the trial court erred in granting the Reliance Defendants' special appearances because specific jurisdiction exists in Texas over the Reliance Defendants. We will examine the jurisdictional allegations as to each of the Reliance Defendants and the Appellant's alter ego theory as to the Reliance Defendants.

As stated above, Plaintiff alleged in his petition that Reliance Worldwide Pty Ltd and GSA Group Pty Ltd are "Australian compan[ies] doing business in the State of Texas[,]" and that GSA Industries Pty Ltd is "an Australian company[.]" Plaintiff also alleged that the Reliance Defendants "had continuous, systematic and sufficient minimum [contacts] with Texas, their actions were directed to the State of Texas, and they purposefully availed themselves of the benefit, advantage and profit of this jurisdiction."

a. Reliance Worldwide Pty Ltd

Reliance Worldwide Pty Ltd attached an affidavit to its special appearance from its Company Secretary, Dale Hudson. Hudson swore to the following:

. . . The business name "Reliance Worldwide" is owned by Reliance Worldwide Pty Ltd.

. . . Reliance Worldwide Pty Ltd is located in Melbourne, Australia, and is registered in Australia as a proprietary limited company.

. . . Reliance Worldwide Pty Ltd is not a resident of Texas.

. . . Reliance Worldwide Pty Ltd is not registered in Texas or any state in the United States. It does not conduct regular or systematic business in Texas or any state in the United States.

. . . Reliance Worldwide Pty Ltd does not maintain a registered agent for service of process in Texas.
. . . Reliance Worldwide Pty Ltd does not maintain a place of business or an office in the State of Texas.

. . . Reliance Worldwide Pty Ltd does not own or lease any property in Texas.

. . . Reliance Worldwide Pty Ltd does not own or operate any vehicles that are registered in Texas.

. . . Reliance Worldwide Pty Ltd has not paid and does not owe any taxes to the State of Texas or any of its political subdivisions.

. . . Reliance Worldwide Pty Ltd does not maintain a bank account, business records, employees or telephone numbers in Texas.

. . . Reliance Worldwide Pty Ltd has no officers or directors residing or domiciled in the State of Texas.

. . . Reliance Worldwide Pty Ltd has not held any executive, shareholder or board meetings in the State of Texas.

25

. . . Reliance Worldwide Pty Ltd does not advertise or solicit business in the State of Texas.

. . . Reliance Worldwide Pty Ltd does not hold regular consultations with customers in Texas.

. . . Reliance Worldwide Pty Ltd does not manufacture or design products specifically for the Texas market.

. . . Reliance Worldwide Pty Ltd did not create, control or employ any distribution system that may have brought any product to Texas.

. . . Reliance Worldwide Pty Ltd does not market products through a distributor who has agreed to serve as a sales agent in the State of Texas.

. . . Reliance Worldwide Pty Ltd has not purposely done any act or consummated any transaction within the State of Texas.

Reliance Worldwide Pty Ltd asserted that it had not purposefully availed itself of the privilege of conducting activities within Texas, and Plaintiff's litigation did not result from injuries that arose from Reliance Worldwide Pty Ltd's contacts with Texas. Reliance Worldwide Pty Ltd also argued that it had not engaged in any "additional conduct" to support jurisdiction, and that "[t]he mere fact that products allegedly placed into the stream of commerce at some point by Reliance Worldwide Pty Ltd. caused harm to Plaintiff is insufficient to subject Reliance Worldwide Pty Ltd. to jurisdiction in Texas."

A deposition transcript of Dale Hudson, a corporate representative of Reliance Worldwide Pty Ltd and GSA Group Pty Ltd, was attached to Reliance Worldwide

26

Pty Ltd's Supplement to its Special Appearance. Hudson testified that Reliance Worldwide Pty Ltd generally sold valves and "was effectively a branch operation of one of the other companies within the group where it sold product into Southeast Asia[,]" and that Worldwide Pty Ltd was dormant and the "last year of [its] trading operations was 2003."

In Plaintiff's Response to Defendants' Special Appearance as well as in Appellant's brief, Plaintiff argued as to Reliance Worldwide Pty Ltd that "[s]ince all of these different Reliance entities are all part of the same identity for purposes of the grand effort to sell TMVs and other specialty plumbing products in the United States, specific personal jurisdiction is appropriate as to them also."

After Reliance Worldwide Pty Ltd negated Plaintiff's jurisdictional allegations, Plaintiff had the burden to come forward with evidence that Reliance Worldwide Pty Ltd had purposeful contacts and that such contacts were substantially connected to the litigation. Because the Plaintiff failed to meet his burden, the trial court did not err in granting Reliance Worldwide Pty Ltd's special appearance.

b. <u>GSA Group Pty Ltd</u>

In GSA Group Pty Ltd's special appearance, GSA Group Pty Ltd attached an affidavit from Dale Hudson, the Company Secretary of GSA Group Pty Ltd, wherein Hudson swore to the following:

27

. . . GSA Group Pty Ltd is located in Melbourne, Australia, and is registered in Australia as a proprietary limited company.

. . . GSA Group Pty Ltd is not a resident of Texas.

. . . GSA Group Pty Ltd is not registered in Texas or any state in the United States. It does not conduct regular or systematic business in Texas or any state in the United States.

. . . GSA Group Pty Ltd does not maintain a registered agent for service of process in Texas.

. . . GSA Group Pty Ltd does not maintain a place of business or an office in the State of Texas.
. . . GSA Group Pty Ltd does not own or lease any property in Texas.

. . . GSA Group Pty Ltd does not own or operate any vehicles that are registered in Texas.

. . . GSA Group Pty Ltd has not paid and does not owe any taxes to the State of Texas or any of its political subdivisions.

. . . GSA Group Pty Ltd does not maintain a bank account, business records, employees or telephone numbers in Texas.

. . . GSA Group Pty Ltd has no officers or directors residing or domiciled in the State of Texas.

. . . GSA Group Pty Ltd has not held any executive, shareholder or board meetings in the State of Texas.

. . . GSA Group Pty Ltd does not advertise or solicit business in the State of Texas.

. . . GSA Group Pty Ltd does not hold regular consultations with customers in Texas.

. . . GSA Group Pty Ltd does not manufacture or design products specifically for the Texas market.

. . . GSA Group Pty Ltd did not create, control or employ any distribution system that may have brought any product to Texas.

. . . GSA Group Pty Ltd does not market products through a distributor who has agreed to serve as a sales agent in the State of Texas.

. . . GSA Group Pty Ltd has not purposely done any act or consummated any transaction within the State of Texas.

We construe the argument in Plaintiff's Response to Defendants' Special Appearance as well as the argument in his appellate brief to be that GSA Group Pty Ltd is a corporate entity related to the other Reliance entities and that, "although the [Sales and Distribution Agreement] purports to be made on behalf of GSA Group Pty. Ltd[,]" GSA Group Pty Ltd "naming was a sham[]" and Hudson testified that GSA Group Pty Ltd never had any active operations. The Sales and Distribution Agreement dated May 23, 2000, between "H G Specialties, Inc." and "GSA Group Pty. Ltd. (ACN 002 634 335)" is attached to Plaintiff's Response to Defendants' Special Appearance.

Hudson's deposition transcript attached to GSA Group Pty Ltd's Supplement to its Special Appearance addressed the Sales and Distribution Agreement and the parties involved in the agreement. Hudson also testified that GSA Group Pty Ltd is a holding company that does not have any operations. The agreement also does not

29

establish whether the parties to the agreement desired for the TMVs to be sold or distributed in Texas. Regardless of whether defendant GSA Group Pty Ltd was a party to the agreement,[5] the Sales and Distribution Agreement would be insufficient to establish contacts by GSA Group Pty Ltd with Texas because nothing therein evidences a substantial connection between GSA Group Pty Ltd and the forum state or the operative facts of this litigation. *See Moki Mac*, 221 S.W.3d at 585. After GSA Group Pty Ltd negated Plaintiff's jurisdictional allegations, Plaintiff failed to present evidence to support its allegations that GSA Group Pty Ltd had any role in the design, manufacture, marketing, sale, or distribution of the TMV made the basis of the suit. The trial court did not err in granting GSA Group Pty Ltd's special appearance.

    c.  GSA Industries (Aust) Pty Ltd

In its special appearance, GSA Industries (Aust) Pty Ltd asserted that it is located in Melbourne, Australia, is registered in Australia as a privately owned proprietary company, there is no nexus between any act by GSA Industries (Aust)

---

[5] Hudson testified that Defendant GSA Group Pty Ltd, which has an Australian Corporate Number (ACN) 004 948 298, was not a party to the Sales and Distribution Agreement, but a different entity that previously had the same name but the ACN 002 634 335 was the party to the agreement with HG Specialties Inc. According to Hudson, the entity that was a party to the agreement with HG Specialties Inc. changed its name in March 2007 to Carnegie Holdings Pty Ltd (ACN 002 634 335).

Pty Ltd in Texas and the death of Larry Morris, the allegations in the lawsuit against GSA Industries (Aust) Pty Ltd do not arise out of any contacts between it and Texas, and GSA Industries (Aust) Pty Ltd has not consented to the jurisdiction of a Texas court. In support of its argument that GSA Industries (Aust) Pty Ltd does not have sufficient minimum contacts with Texas to allow the trial court to exercise jurisdiction over GSA Industries (Aust) Pty Ltd, the company asserted the following:

> . . . GSA Industries (Aust) Pty Ltd is a corporation organized under the laws of Australia.
>
> . . . GSA Industries (Aust) Pty Ltd has its registered office in Melbourne, Australia.
>
> . . . GSA Industries (Aust) Pty Ltd is not registered in Texas or any of the United States and does not conduct regular or systematic business in Texas.
>
> . . . GSA Industries (Aust) Pty Ltd does not maintain a registered agent for service of process in Texas.
> . . . GSA Industries (Aust) Pty Ltd also does not maintain a place of business in Texas.
>
> . . . GSA Industries (Aust) Pty Ltd does not own or lease any property in Texas.
>
> . . . GSA Industries (Aust) Pty Ltd also does not own or operate any vehicles that are registered in Texas.
>
> . . . GSA Industries (Aust) Pty Ltd has not paid or owed any taxes to the State of Texas or any of its political subdivisions.
>
> . . . GSA Industries (Aust) Pty Ltd does not maintain a bank account, business records, employees, or telephone numbers in Texas.

31

. . . GSA Industries (Aust) Pty Ltd has no officers or directors residing or domiciled within the State of Texas.

. . . GSA Industries (Aust) Pty Ltd has not held any executive, shareholder, or board meetings in the State of Texas.

. . . GSA Industries (Aust) Pty Ltd does not advertise or solicit business in Texas or provide regular advice to customers in Texas.

. . . GSA Industries (Aust) Pty Ltd does not regularly consult with any customers in Texas.

. . . GSA Industries (Aust) Pty Ltd does not distribute products for sale directly into Texas.

We construe Appellant's argument in Plaintiff's Response to Defendants' Special Appearance and his brief to argue that GSA Industries (Aust) Pty Ltd manufactures TMVs in Australia and places them into the stream of commerce for sale in the United States and, therefore, the trial court has specific jurisdiction over GSA Industries (Aust) Pty Ltd. Hudson's deposition transcript attached to Plaintiff's Response to Defendants' Special Appearance reflects that the company that manufactured the majority of the product that Reliance Worldwide Pty Ltd sold was a company called GSA Industries (Aust) Pty Ltd, which he explained is "now called Reliance Worldwide Corporation (Aust). Pty. Ltd." It appears that Appellant is contending that because GSA Industries (Aust) Pty Ltd placed TMVs into the stream of commerce that the trial court has jurisdiction over GSA Industries (Aust) Pty Ltd.

32

Appellant relies to some degree on Hudson's testimony that the only company in the group of related entities that would have directly distributed products to the United States in 2000 or 2003 would have been GSA Industries (Aust) Pty Ltd.

In *Spir Star*, the Texas Supreme Court explained the following with respect to a stream-of-commerce argument:

> . . . a seller's awareness "'that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.'" *CSR*, 925 S.W.2d at 595 (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Court of Cal.*, 480 U.S. 102, 112 . . . (1987) (plurality opinion)). Instead, our precedent generally follows Justice O'Connor's plurality opinion in *Asahi*, which requires some "additional conduct"—beyond merely placing the product in the stream of commerce—that indicates "an intent or purpose to serve the market in the forum State." *Asahi*, 480 U.S. at 112; *Moki Mac*, 221 S.W.3d at 577; *Michiana*, 168 S.W.3d at 786. Examples of this additional conduct include: (1) "designing the product for the market in the forum State," (2) "advertising in the forum State," (3) "establishing channels for providing regular advice to customers in the forum State," and (4) "marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Asahi*, 480 U.S. at 112; *see also Moki Mac*, 221 S.W.3d at 577; *Michiana*, 168 S.W.3d at 786; *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 201 (Tex. 1985).

310 S.W.3d at 873. In discussing whether a non-resident manufacturer's use of a Texas distributor could establish "additional conduct," the Court noted that there are limitations to the rule that

> "[I]f the sale of a product of a manufacturer . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer . . . to serve *directly or indirectly*, the market for its product in other States, it is not

33

> unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others."

*Id.* at 874 (quoting *World-Wide Volkswagen*, 444 U.S. at 297 (emphasis added)). The limitations include the following: the rule only applies to the specific jurisdiction context because stream-of-commerce analysis is relevant only to the exercise of specific jurisdiction; when a nonresident's only contacts with Texas involve indirect sales through a distributor or subsidiary, specific jurisdiction is limited to claims arising out of those sales; there must be a substantial connection between the product claim and the manufacturer (that similar products were sold in Texas would not create a substantial connection as to products that were not; and, the manufacturer must have intended to serve the Texas market (i.e., marketing the product through a distributor who has agreed to serve as the sales agent in the forum State). *Id.* at 874-75.

Plaintiff failed to present evidence of "additional conduct" by GSA Industries (Aust) Pty Ltd: that products manufactured by GSA Industries (Aust) Pty Ltd were sold or distributed to end users in Texas, that GSA Industries (Aust) Pty Ltd targeted any marketing towards Texas, that GSA Industries (Aust) Pty Ltd sold the TMV to a Texas company, that GSA Industries (Aust) Pty Ltd manufactured the TMV made the basis of the present lawsuit, or how the TMV arrived in Texas. After GSA

34

Industries (Aust) Pty Ltd negated Plaintiff's jurisdictional allegations, Plaintiff had the burden to come forward with evidence that GSA Industries (Aust) Pty Ltd had purposeful contacts and that such contacts were substantially connected to the litigation. Because the Plaintiff failed to meet his burden, the trial court did not err in granting GSA Industries (Aust) Pty Ltd's special appearance.

    d.  <u>Alter Ego Theory as to the Reliance Defendants</u>

Plaintiff also argues that the trial court had specific jurisdiction over the Reliance Defendants under an alter ego or single business enterprise theory because the "Reliance entities are all part of the same identity for purposes of the grand effort to sell scald-protector/TMVs and other specialty plumbing products in the United States[.]" In *BMC Software*, the Texas Supreme Court explained:

> Personal jurisdiction may exist over a nonresident defendant if the relationship between the foreign corporation and its parent corporation that does business in Texas is one that would allow the court to impute the parent corporation's "doing business" to the subsidiary. *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983); *Walker v. Newgent*, 583 F.2d 163, 167 (5th Cir. 1978). The rationale for exercising jurisdiction is that "the parent corporation exerts such domination and control over its subsidiary 'that they do not in reality constitute separate and distinct corporate entities but are one and the same corporation for purposes of jurisdiction.'" *Hargrave*, 710 F.2d at 1159 (citations omitted); *see also Conner v. ContiCarriers & Terminals, Inc.*, 944 S.W.2d 405, 418 (Tex. App.—Houston [14th Dist.] 1997, no writ). The party seeking to ascribe one corporation's actions to another by disregarding their distinct corporate entities must prove this allegation. *Walker*, 583 F.2d at 167; *Conner*, 944 S.W.2d at 418-19; *see also Lucas v. Texas Indus., Inc.*, 696 S.W.2d 372, 375 (Tex.

1984). This is because Texas law presumes that two separate corporations are indeed distinct entities:

> The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime. *Bell Oil & Gas Co. v. Allied Chem. Corp.*, 431 S.W.2d 336, 339 (Tex. 1968) (citations omitted).

> To "fuse" the parent company and its subsidiary for jurisdictional purposes, the plaintiffs must prove the parent controls the internal business operations and affairs of the subsidiary. *Conner*, 944 S.W.2d at 418-19 (discussing *Hargrave*, 710 F.2d at 1160; *Walker,* 583 F.2d at 167). But the degree of control the parent exercises must be greater than that normally associated with common ownership and directorship; the evidence must show that the two entities cease to be separate so that the corporate fiction should be disregarded to prevent fraud or injustice. *See Hargrave*, 710 F.2d at 1160; *Conner*, 944 S.W.2d at 419; *see also Gentry v. Credit Plan Corp. of Houston*, 528 S.W.2d 571, 573 (Tex. 1975).

83 S.W.3d at 798-99. When a plaintiff asserts jurisdiction over a nonresident defendant under an alter ego theory, the plaintiff has the burden to overcome the presumption of separateness by proving its alter ego allegation. *Id*. at 798. We conclude that Plaintiff failed to meet his burden to present evidence to support his allegations and to "fuse" the respective entities, and to overcome the presumption of separateness of the entities. *See id.*

Under this record, there is a lack of evidence that any of the Reliance Defendants purposefully availed themselves of the benefits of conducting activities

in Texas. There is a lack of evidence of a substantial connection between each of the Reliance Defendant's contacts with Texas, if any, and the operative facts of the litigation. The trial court did not err in granting the Reliance Defendants' special appearances. Issue three is overruled.[6]

We affirm the trial court's orders.

AFFIRMED.

_____
LEANNE JOHNSON
Justice

Submitted on February 24, 2016
Opinion Delivered February 28, 2017

Before McKeithen, C.J., Horton and Johnson, JJ.

---

[6] Having overruled Appellant's stated issues, we need not address his argument that the assertion of personal jurisdiction over Appellees would not offend traditional notions of fair play and substantial justice. *See Shell Compania Argentina de Petroleo, S.A. v. Reef Expl., Inc.*, 84 S.W.3d 830, 840-41 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).